UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

|  |  |
|---|---|
| BETTY J. K., | **4:20-CV-04139-VLD** |
| Plaintiff, |  |
| vs. | MEMORANDUM OPINION AND ORDER |
| KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,[1] |  |
| Defendant. |  |

## INTRODUCTION

Plaintiff, Betty J. K., seeks judicial review of the Commissioner's final decision denying her application for social security disability benefits under Title II of the Social Security Act.[2]

Ms. K. has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and remand with instructions for the Commissioner to award benefits. Alternately, Ms. K. has requested remand for further development under 42 U.S.C. § 405(g). The Commissioner asks the court to affirm its decision below.

---

[1] Ms. K. originally named Andrew Saul, former Commissioner of the Social Security Administration, as the defendant. Mr. Saul has been separated from that office. According to Federal Rule of Civil Procedure 25(d), Mr. Kijakazi is substituted in his place.

[2] Social Security Disability Income/Disability Insurance Benefits (SSDI/DIB) are called "Title II" benefits. Receipt of Title II benefits is dependent upon whether the claimant is disabled.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[3]

### A.    Procedural History

This action arises from Ms. K.'s application for Social Security Disability Income (SSDI) with a protected filing date of April 19, 2018, alleging disability starting December 15, 2017, due to obesity, overactive bladder, hypertension, arthritis of feet and toes, arthritis of right knee, fibromyalgia, anxiety, depression, social anxiety, back pain, shoulder pain, and arthritis in fingers. T153, 185, 227, 228, 232.[4]  Ms. K. reported she was 5'2" tall and weighed 243 pounds.  T185.

Ms. K.'s claims were denied at the initial and reconsideration levels, and Ms. K. requested an administrative hearing.  T89, 97, 103.

Ms. K.'s administrative law judge ("ALJ") hearing was held on November 20, 2019, where different counsel than current counsel represented Ms. K. T37.  An unfavorable decision was issued January 6, 2020, by the ALJ.  T12.

---

[3] These facts are recited from the parties' stipulated statement of facts (Docket No. 16).  Unless otherwise noted, the court has made only minor grammatical and stylistic changes.

[4] Citations to the appeal record will be cited as "T" followed by page number or numbers.

At Step One of the evaluation, the ALJ found that Ms. K. had not engaged in substantial gainful activity since December 15, 2017, the alleged onset of disability date.  T17.

At Step Two, the ALJ found that Ms. K. had a severe impairment of arthritis of the left acromioclavicular[5] joint, pes planus of the right foot, plantar fasciitis of the right foot, osteoarthritis of the bilateral knees, and obesity.  Id. The ALJ found that each of those impairments caused more than a minimal effect on Ms. K.'s ability to perform work-related activities.  Id.

The ALJ stated that Ms. K. alleged other impairments and that the record showed she had been treated or evaluated for other symptoms and complaints that appear periodically throughout the record, but these alleged impairments had only caused transient and mild symptoms and limitations, are well controlled with treatment, have not met the 12-month durational requirement, or are otherwise not adequately supported by the medical evidence.  T17-18. The ALJ found those alleged impairments do not constitute severe medically determinable impairments, and stated, "These include, but are not limited to hypertension, venous insufficiency, diverticulosis, nephrolithiasis, overactive bladder, vertigo, and heart palpations."  T18.  The ALJ stated he considered the effect of any non-severe impairments, but he did not state whether these impairments were medically determinable or identify what other impairments he found in the records that he did not list.  Id.

---

[5] The shoulder joint.

The ALJ stated that the record included a diagnosis of fibromyalgia and Ms. K.'s treating physician indicated clinically that Ms. K. had fibromyalgia, but asserted it was not a medically determinable impairment because there was no evidence that Ms. K. was diagnosed with fibromyalgia under the requirements of Social Security Ruling ("SSR") 12-2p.  Id.  The ALJ stated, "Specifically, there is no evidence of the location of the claimant's pain with palpation in at least eleven tender point sites or that she had repeated manifestation of six or more fibromyalgia symptoms during the relevant period, with evidence that other disorders that could cause the symptoms were excluded."  T18.

The ALJ stated that Ms. K.'s medically determinable impairments of depressive disorder and anxiety disorder did not cause more than minimal limitations in Ms. K.'s ability to perform basic mental work activities and were therefore non-severe.  Id.  The ALJ found that Ms. K. did not have more than a mild limitation in her ability to understand, remember or apply information, interact with others, concentrate, persist or maintain pace, and adapt or manage oneself.  Id.

The ALJ determined that Ms. K. had residual functional capacity, ("RFC"), to:

> perform sedentary work . . . except the claimant can lift or carry 20 pounds occasionally, and 10 pounds frequently; stand or walk two hours in an eight-hour workday and sit six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch or

4

crawl; frequently reach overhead with the left upper extremity; and should avoid all exposure to workplace hazards. T21.

The ALJ found that Ms. K.'s medically determinable impairments could reasonably be expected to cause the symptoms alleged by Ms. K., however, her statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." T23.

The ALJ found at Step Four that Ms. K. could perform past relevant work as a licensed customer service representative, DOT# 219.387-014, as generally performed, and denied Ms. K.'s claim. T28.

The ALJ considered the opinions of the State agency medical consultants and found them persuasive because the assessments were consistent with the record and supported by a reasonable explanation of the medical evidence relied upon in making the assessment. T27.

The ALJ considered the opinions of the State agency psychological consultants and found them persuasive because they were consistent with the record and the absence of mental health treatment during the relevant period, Ms. K.'s negative self-assessments, and Ms. K.'s reports that her symptoms were well controlled with medication. T20.

The ALJ considered the opinions of Ms. K.'s treating physician, Rachel Sunne, MD, who submitted a letter dated October 1, 2019, indicating Ms. K. was unable to work at any type of full-time job, due to her medical conditions, especially her fibromyalgia, anxiety, and depression, and appears to have

5

rejected the treating physician's opinions.  T27.  The ALJ stated administrative findings regarding ability to work are reserved to the Commissioner, Dr. Sunne's statements are not supported by Ms. K.'s self-assessments, the diagnosis of fibromyalgia is not supported, and the statements do not provide specific functional limitations.  Id.

Ms. K. requested review of the ALJ's denial from the Appeals Council, which was denied, making the ALJ's decision final.  T1-6, 151.  Ms. K. timely filed this action.

## B.  Medical Evidence Before the Adjudicated Period Began on December 15, 2017

Ms. K. was seen at Avera Medical Group (AMG) Brookings [South Dakota] on April 25, 2017, for an annual health maintenance exam and reported her biggest issue was feeling depressed.  T415.  Ms. K.'s PHQ-9 score[6] was 20, which the physician described as markedly positive.  T415, 417.  Physically, Ms. K. was concerned about arthritis in her right knee and a little pain especially with walking.  T415.  Physical examination showed some crepitus with range of motion of her right knee, but no cyanosis, clubbing, or edema. Id.  Ms. K. indicated she was aware she needed to walk or exercise to lose

---

[6] The PHQ9 (Patient Health Questionnaire-9) is a nine-item depression scale of the patient health questionnaire.  McGowan v. Astrue, No. 12-cv-281-TSZ-BA, 2012 WL 5390337, at *3 n.5 (W.D. Wash. Oct. 17, 2012).  The PHQ9 is divided into the following categories of increasing severity: 0–4 (minimal), 5–9 (mild), 10–14 (moderate), 15–19 (moderately severe), and 20-27 (severe). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last checked October 5, 2021); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6371338/ (last checked October 5, 2021).

weight but had a hard time due to her knee pain.  Id.  Ms. K.'s depression medication was changed to bupropion.  T416.

Ms. K. was seen by Sandra Diedrich, MS, LPC, LPC-MH, QMHP on May 10, 2017, for depression, being irritable, having a "foggy mind", anxiousness, insomnia, processing difficulty, poor memory, feelings of low self-worth, feeling lethargic, short attention span, poor family relations, and feeling overwhelmed by medical financial debt.  T608.  Ms. K.'s symptoms indicated generalized anxiety and major depressive disorder.  Id.

Ms. K. reported difficulty in her work setting.  Id.  She reported her social interaction included sometimes caring for grandchildren and infrequently visiting with a neighbor.  T607.  She complained of leg pain but did not indicate that any daily physical activities were significantly impacted.  Id.  Ms. Diedrich stated that during treatment Ms. K. seemed to ruminate on distorted thoughts which heightened symptoms of anxiety and contributed to symptoms of depression.  Id.  Ms. K. reported that while ruminating on distorted thoughts she would be distracted at work and found it difficult to concentrate on tasks.  Id.

Ms. K. had six counseling sessions focused on learning coping skills to deal with her anxiety and depression between May 10 and June 26, 2017, and then stopped treatment due to financial constraints.  T608-609.  Response to treatment was none to minimal due to insufficient time.  T609.  Ms. Diedrich opined on August 28, 2018, Ms. K. was able to maintain basic skills for self-care and homelife, but her ability to maintain work was dependent upon her

ability to utilize coping skills, including cognitive reframing and medication compliance.  Id.

Ms. K. was seen by Rachel Sunne, MD at AMG Brookings on June 15, 2017, to follow up on her depression.  T410.  Ms. K. had previously tried Wellbutrin and Zoloft, without help, and recently switched to Celexa, and she felt was doing well regarding her mood.  Id.  She was going to counseling and had been doing better in terms of overall function and symptoms.  Id.  Ms. K.'s PHQ-9 score was 9, indicating physicians should use clinical judgment based on duration of symptoms and functional impairment.  T408.  Ms. K. also reported swelling in her left ankle with no known injury.  T410.  Ms. K. inquired about fibromyalgia and wanted more information.  Id.  She noted some aches and pains in her joints.  Id.  Ms. K.'s assessments included major depressive disorder in partial remission, and her medication was continued with continued counseling recommended.  T411.

Ms. K. was seen by Rachel Sunne, MD, at AMG Brookings on October 3, 2017, for generalized pain, with the worst pain in her left shoulder, upper arm, and left upper back.  T400.  Ms. K. reported her left shoulder pain as 10/10. T402.  Examination revealed pain with palpation over the AC joint, abnormal range of motion, and positive drop-arm testing.  T405.  Physical therapy was recommended, but Ms. K. had financial concerns, so a shoulder injection was administered.  Id.  She was working 3 days per week at a desk job and the aching in her legs was worse when she sat or stood for long periods.  T404. Ms. K.'s PHQ-9 score was 3, negative for depression.  T401.

8

**C.    Medical Evidence between Ms. K.'s Onset Date and the Date of the ALJ's Decision**

Ms. K. was seen by Rachel Sunne, MD, at AMG Brookings on January 10, 2018, for an overactive bladder, weight gain, and aching in her arms and legs.  T394.  Ms. K. reported generalized achiness and weakness through her shoulder and upper arm area ongoing for months.  T397.  Ms. K. reported her achiness was worse in the morning and might be improved with activity.  Id. She felt her arm pain was worse when lifting her granddaughters, or any kind of physical activity.  Id.  She noted she mostly just sat at home and watched television.  Id.

Dr. Sunne stated Ms. K. had known left AC joint arthritis and an injection had been tried at the last visit but had not helped much.  Id.  Ms. K. also reported aches and pain in different spots throughout her body including upper and lower extremities and feeling fatigued especially since being fired from her job.  T397.

Examination revealed depressed mood and flat affect, tenderness to palpation diffusely through the back to the bilateral paraspinous muscles, over the shoulders and upper arms, and tenderness to light palpation over the lower extremities, normal strength in the upper extremities, including grip, and normal reflexes and gait.  Id.  She had no difficulty getting up from a chair.  Id.

Ms. K.'s assessments included muscle soreness, weakness, urinary incontinence, and high body mass index ("BMI").  T397-398.  Dr. Sunne felt Ms. K.'s differential diagnosis for weakness included fibromyalgia versus polymyalgia rheumatica ("PMR"), so erythrocyte sedimentation rate ("ESR") and

C-reactive protein ("CPR") will be checked and if inflammatory markers are normal fibromyalgia is suspected.  T398.  Dr. Sunne discussed the importance of physical activity.  Id.  Dr. Sunne discussed medications, but Ms. K. was concerned about side effects.  Id.

Ms. K. was seen at the AMG Specialty Care on January 16, 2018, due to stress urinary incontinence.  T390.  Medications had been tried without improvement, and a cystoscopy was planned.  T392-393.

Ms. K. was seen at the AMG Specialty Care on January 23, 2018, for a cystoscope exam due severe stress urinary incontinence.  T388.  Treatment options were discussed, and a suprapubic urethral sling operation was planned.  Id.  Ms. K. had the sling surgery on January 29, 2018.  T455.

Ms. K. was seen by Rachel Sunne, MD at AMG Brookings on February 27, 2018, for a medication check and Ms. K. felt the Cymbalta recently prescribed for fibromyalgia concerns was working.  T372.  She felt much better. Id.  Ms. K. PHQ-9 score was 10, or positive for depression.  T370.  Ms. K. had complained of diffuse pains, fatigue, and depression and the Cymbalta had not completely resolved her pain but helped some especially with her aches.  T372. Ms. K. reported she still had mornings where she aches all over, but overall things are better.  Id.

Regarding Ms. K.'s varicose veins, she reported her pain did not worsen with walking.  Id.  She also noted improvement in mood and was not interested in counseling.  Id.  Ms. K. admitted she was not active and mostly just laid on

the couch.  Id.  Dr. Sunne highly encouraged her to engage in regular physical activity to help with fibromyalgia pain and her weight.  Id.

Ms. K. was seen at the North Central Heart on March 19, 2018, due to varicose veins bothering her in her groin area and down her leg.  T331.  Ms. K. assessments were venous insufficiency and varicose veins of the lower extremity with pain, and laser ablation was planned.  T334.

Ms. K. was seen at the Surgical Institute on March 27, 2018, to discuss a repeat gastric bypass.  T286, 288.  Ms. K. weighed 245 pounds and her BMI was 44.8.  T286.  An upper endoscopy was planned to evaluate options.  T289. On review of symptoms, Ms. K. denied fatigue, back pain, joint pain, joint swelling, limited range of motion, muscle aches, muscle weakness or stiffness, altered mental state, or memory problems.  T288-289.

Ms. K. was seen at the North Central Heart on April 11, 2018, due to venous insufficiency and varicose veins and laser ablation and micro-phlebectomy of the right leg with 25 stab incisions was performed.  T325.

Ms. K. was seen by Rachel Sunne, MD at AMG Brookings on April 30, 2018, to follow up on her bladder sling surgery and reported overall her stress incontinence was better but she still had urinary frequency.  T366.  She noted that she had seen a surgeon to discuss repeat bypass surgery, but her bypass was intact and there was nothing he could do.  Id.  The surgeon said she needed to improve her diet and exercise to lose weight.  Id.

Ms. K. had been recently diagnosed with fibromyalgia and done well on her Cymbalta.  Id.  Her PHQ9 score was 5, and her overall mood was good.

11

T362, 366.  Her GAD-7[7] score was 2.  T363.  Ms. K.'s assessments included stress incontinence, fibromyalgia, high BMI, history of gastric bypass, and depression, in partial remission.  T367.  Her Cymbalta dosage was increased to see if it would help with urinary symptoms.  Id.  She was open to considering Dr. Sunne's suggestion that she be more active and volunteer or find a part-time job to keep busy.  Id.

Ms. K. was seen at the AMG Specialty Care on May 3, 2018, to follow up on her bladder sling surgery and concerns over stream direction and frequency. T294.  Ms. K. complained of significant urinary frequency and was prescribed oxybutynin.  T294-295.

Ms. K. was seen at the North Central Heart on May 9, 2018, to follow up on her laser ablation and micro-phlebectomy on her right leg performed in April.  T304.  Ms. K. reported that she feels good and can sleep on the left and was "not bothered by the heavy and tired feeling; it has gone away."  Id.

Ms. K. was seen by Rachel Sunne, MD, at AMG Brookings on May 18, 2018, and reported that she had gone ahead and applied for disability, noting right ankle problems, bilateral knee pain, and left shoulder pain.  T349, 353. Shoulder examination revealed abnormal appearance of her left shoulder, no pain to palpation over the AC joint or rotator cuff tendons, pain over superior

---

[7] GAD-7 is a measurement for generalized anxiety disorder. https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/410326 (last checked October 5, 2021).  A score of "0-5" indicates mild anxiety, "6-16" indicate moderate anxiety, and "17-21" indicates severe anxiety. T363.

trapezius on the left, muscle tension, and mild pain with abduction and adduction.  T353.

Her bilateral knees appeared normal upon visualization with full range of motion but mild tenderness along the medial or lateral joint spaces and no tenderness in bilateral feet.  Id.  X-rays of Ms. K.'s left and right knees both showed moderately severe patellofemoral degenerative change.  T421-422. X-rays of her left shoulder showed mild hypertrophic degenerative changes of the acromioclavicular joint and impression was no acute osseous abnormality. T423.  Osteoarthritis was suspected in her right ankle and bilateral knees. T354.  In her knees, mild osteoarthritis was suspected but it was not severe for her and there were no concerning exam findings.  T354.  Bilateral foot discomfort was intermittent and not bothersome.  Id.  Ms. K.'s BMI was 44.7, and Dr. Sunne highly encouraged weight loss to help with her joints and regular activity to help her fibromyalgia.  T349, 354.

Ms. K. was seen at the AMG Specialty Care on June 1, 2018, due to bilateral knee pain.  T507.  Ms. K. reported knee pain present for years with a history of a right patella fracture years earlier, but the pain had gradually worsened.  Id.  She reported her pain was 0/10 at rest, 3/10 when walking on flat surfaces, and 10/10 when climbing stairs.  Id.  Examination of her knees revealed some tenderness to palpation, crepitus, and minimally antalgic gait pattern.  T511.  She had full range of motion in the bilateral knees with 5/5 strength in the quadriceps.  Id.  Dr. Mayer reviewed X-rays taken the day of the exam and the prior set of X-rays, (taken May 18, 2018 – T592), and stated that

X-rays revealed moderate to severe osteoarthritis in her knees.  Id.
Nonoperative options of weight loss, topical agents, and acetaminophen were
recommended, along with an exercise bike and/or swimming program.  Id.
The radiologist's report for the X-rays of the bilateral knees taken June 1,
2018, showed mild osteoarthritis in the medial and lateral compartment of
both knees.  T590.  Degenerative findings were probably not advanced for
her age.  Id.

Ms. K. was seen at the AMG Specialty Care on June 4, 2018, to follow up
on her overactive bladder and reported that with her sling surgery and taking
oxybutynin she had no current urinary complaints.  T505.

Ms. K. was seen at the AMG Specialty Care on October 25, 2018, due to
right foot pain.  T626.  Ms. K. reported foot pain since breaking the foot years
earlier and was worse with activity and standing.  Id.  Symptoms had not
worsened since her accident.  Id.  Examination revealed tenderness to
palpation, and an inability to complete single heel rise to the right foot.  T626.
Muscle strength was 5/5 to the lower extremity.  Id.  Ms. K.'s assessment was
pain associated with plantar fasciitis and pes planus to the right lower
extremity.  T627.  Conservative and surgical treatment options were discussed.
Id.  Ms. K. chose to proceed with rest, ice, and elevation as much as possible
and declined anti-inflammatory medication and steroids because she was
unable to take NSAIDS and wished to avoid steroids.  Id.  She was
recommended to try over-the-counter inserts to support her arch and was
given a handout with stretching exercises.  Id.

14

Ms. K. was seen at the AMG Specialty Care on January 11, 2019, to follow up on continued right foot pain, and reported she had not obtained the power step inserts previously recommended because she could not afford them and had been unable to perform the recommended stretching because of the pain it caused in her knee.  T905.  She was not icing the lower extremity as recommended but was elevating it most of the day laying on a couch.  Id.  Ms. K. reported her pain was moderate, consistent, and came and went.  Id.

The provider noted Ms. K. had not been very diligent in trying to better her discomfort.  Id.  The provider also noted she had applied and been denied for disability two times.  Id.  It was noted that if she was unable to afford the inserts, her provider would work with her to find something that could benefit her.  T906.  Physical therapy was also noted as an option.  Id.  The provider demonstrated stretching exercises and Ms. K. agreed to do them at home.  Id.

Ms. K. was seen at the AMG Specialty Care on April 30, 2019, due to left knee pain following a fall a month or so earlier.  T887.  Ms. K. reported some improvement in the pain but had intermittent pain which rated 4-5/10 with activity and 1-2/10 at rest.  T887.  X-rays of the knee revealed moderate to severe osteoarthritis, and after consideration of treatment options Ms. K. opted for continued nonoperative treatment with over-the-counter medication, heat, and ice.  T891.  X-rays of both knees were obtained and both revealed chondromalacia with lateral patellar tracking symmetrically in both knees.  T911.

Ms. K. was seen by Rachel Sunne, MD, at AMG Brookings on May 9, 2019, for a female physical and reported a flare in her plantar fasciitis and again reported dizziness with turning in bed and looking up or down. T879. Depression was negative. T880. Her GAD score was 1. Id. Ms. K.'s assessments included vertigo, chronic left knee pain, plantar fasciitis of the right foot, fibromyalgia, depression in full remission, and BMI 44.1. T879, 885. She was doing well regarding mood and the fibromyalgia. T885. She was keeping busy and seemed excited and upbeat. Id.

Ms. K. was seen at the AMG Specialty Care on May 20, 2019, to follow up on her left knee pain and was seeking medication for the pain, and tramadol was prescribed. T874, 878.

Ms. K. was seen at the AMG Specialty Care on May 30, 2019, to follow up on her left knee and reported continued and worsening left knee pain, worse with activity, and an MRI was scheduled. T868.

An MRI of Ms. K.'s left knee was obtained on June 6, 2019, and revealed tricompartmental cartilage disease severe in the patellofemoral compartment, tears of the medial meniscus, degeneration/irregularity of the lateral meniscus, and Baker's cyst and joint effusion. T726-727.

Ms. K. had left knee surgery at the Brookings Hospital on June 12, 2019, consisting of arthroscopy with medial meniscectomy and medial femoral condyle chondroplasty. T734.

Ms. K. was seen at the AMG Specialty Care on June 25, 2019, to follow up on her left knee and reported significant ongoing pain worse with activity

following surgery.  T849.  Examination revealed range of motion almost full extension, antalgic gait pattern, and tenderness to palpation.  T853.  The pain was felt to be related to severe osteoarthritis and a steroid injection was administered.  Id.

Ms. K. was seen at the AMG Specialty Care on August 20, 2019, to follow up on her left knee and reported continued pain 9 weeks post-surgery.  T838.  Ms. K. rated her pain 7/10 at rest and 10/10 when walking, and reported the injection received two months earlier had not helped.  Id.  Examination revealed mild swelling, moderate to severe tenderness to palpation, moderate to severely antalgic gait pattern, and moderate to severe patellofemoral crepitus.  T842.  Left knee replacement surgery was planned.  Id.

Ms. K. was seen at the Brookings emergency room on September 6, 2019, after fracturing her toe with a cane.  T791, 794.  The record states that Ms. K. was walking with a cane and a walker following left knee replacement surgery.[8]  T791.  On September 11, 2019, it was noted that Ms. K.'s plantar fasciitis had resolved, and she had no pain in her plantar heel.  T831.

Ms. K. was seen by Rachel Sunne, MD at AMG Brookings on September 16, 2019, for a preoperative exam for a planned knee replacement surgery.  T827.  Ms. K. reported intolerable knee pain rated 10/10, daily heart palpations, and arthritis at the distal joint of her right pointer finger.  T825,

---

[8] There appears to be a discrepancy in Ms. K.'s medical records.  According to T791, Ms. K. "has had a left knee replacement" as of September 6, 2019.  Then, on T827, Ms. K. visited Dr. Sunne on September 16, 2019, for a "preoperative exam" for her left knee replacement surgery.  Thus, the medical records are in error and the parties' joint statement of material facts is accurate.

827.  She reported being able to walk four blocks or climb two flights of stairs without chest pain, limited by knee.  T827.  Examination revealed mild swelling, erythema, and slight deformity of her finger, and her heart palpations were suspected to be related to anxiety.  T828.  Conservative options or a referral to a hand surgeon were given as treatment options for her finger but she wanted to hold off on the hand surgeon referral.  Id.

Rachel Sunne, MD, wrote a letter on October 1, 2019, stating that she had been Ms. K.'s treating physician since June 2017 and listed her past medical history including fibromyalgia, severe anxiety, depression, social anxiety, hypertension, venous insufficiency, diverticulitis, nephrolithiasis, overactive bladder, and more recently osteoarthritis of her knee with a planned knee replacement, and an abnormal heart rhythm.  T913.  Dr. Sunne stated that due to Ms. K.'s medical conditions, especially regarding her fibromyalgia, anxiety, and depression, Ms. K. was unable to work any type of job 8 hours per day, 5 days per week.  Id.  Dr. Sunne stated that pain associated with fibromyalgia limited Ms. K.'s physical activity, and additionally with her anxiety and depression she cannot sustain a full workload or full-time job.  Id.  Dr. Sunne stated that Ms. K.'s fibromyalgia is a chronic problem that will not resolve and will likely continue to limit her abilities moving forward.  Id.  Dr. Sunne invited inquiry if any further assistance was needed.  Id.

Ms. K. was seen at the North Central Heart on October 8, 2019, for a pre-operative evaluation and due to daily heart palpations.  T1008.  She reported having palpations over the last couple months that lasted about 30

18

seconds and resolved on their own with no associated symptoms.  Id.
Examination revealed palpations, and a sinus pause.  T1013.

**D.      State Agency Assessments**

James Barker, M.D., the State agency medical consultant at the initial
level reviewed the file on August 15, 2018, and concluded Ms. K. had severe
dysfunction – major joints, severe obesity, and severe fibromyalgia.  T69.  The
consultant also found Ms. K. had essential hypertension and other disorders of
the urinary tract, which were non-severe impairments.  Id.  The consultant
concluded Ms. K. was limited to lifting 20 pounds occasionally, 10 pounds
frequently, standing and/or walking four hours per workday, sitting more than
six hours per workday, never climbing ladders/ropes/scaffolds, occasionally
climbing ramps/stairs, frequently balancing, and occasionally stooping,
crouching, crawling, and kneeling.  T71-72.  The consultant also stated Ms. K.
was limited to frequent reaching overhead on the left due to pain and mild AC
joint DJD.  T73.

The State agency medical consultant at the reconsideration level
reviewed the file on December 6, 2018, and concluded Ms. K. had severe
dysfunction—major joints, severe obesity, and severe fibromyalgia.  T82.  The
consultant also found Ms. K. had essential hypertension and other disorders of
the urinary tract, which were non-severe impairments.  Id.  The consultant
concluded Ms. K. was limited to lifting 20 pounds occasionally, 10 pounds
frequently, standing and/or walking four hours per workday, sitting more than
six hours per workday, never climbing ladders/ropes/scaffolds, occasionally

19

climbing ramps/stairs, frequently balancing and stooping, and occasionally crouching, crawling, and kneeling.  T84-85.  The consultant also stated Ms. K. was limited to frequent reaching overhead on the left due to pain and mild AC joint DJD.  T86.

The State agency psychological consultant at the initial level reviewed the file on September 5, 2018, and concluded Ms. K. had depression and anxiety, but both were non-severe, so no mental RFC was completed.  T69.  The State agency psychological consultant at the reconsideration level made identical findings on December 7, 2018.  T83.

**E.    Other Evidence**

In a work activity report completed as part of the application process, Ms. K. identified her job at Ben Hauk Agency as an: "Insurance Agent."  T202. In a work history report completed as part of the application process Ms. K. listed her job titles from May 2012 through December 2017 as either insurance agent or agent assistant.  T217.  She listed her job titles before July 2012 as interviewer, receptionist, unit clerk, and postal clerk.  Id.  In the work history report Ms. K. stated she worked as an "Agent Assistant" from June 2014 through December 2017 and she "Sold insurance policies, received premium payments from customers, made changes to policies, filed documents."  T217-218.  She stated she worked as an Insurance Agent from May 2012 to June 2014.  T217.  She said during this time, after training, she answered telephones, sold insurance policies, made changes to policies, filed documents, and received payments.  T217-218, 220-221.

20

In the past work summary report prepared by the vocational expert (VE) hired by the Social Security Administration ("SSA"), the expert listed Ms. K.'s past work in the insurance industry as "Insurance Agent" DOT #250.257-010, a skilled specific vocational preparation (SVP) 6 level job. T275. The VE also listed the unskilled, SVP 2, job of interviewer DOT #205.367-054, a semiskilled SVP 4 job of receptionist DOT #237.367-038, the semiskilled SVP 3 job of unit clerk DOT #245.362-014, and the semiskilled SVP 4 job of postal clerk DOT #243.367-014. Id.

In a function report completed as part of the application process Ms. K. stated her depression and anxiety caused her to be "on guard" all the time and made interaction with others very difficult. T227. Ms. K. stated she had no difficulties with personal care and could prepare simple meals. T228-229. Ms. K. stated she did laundry—two loads per week, vacuumed once per week, and spent five minutes loading and unloading the dishwasher three times per week. T229. She was able to drive a car, leave her house alone, and went outside for appointments or to the store. T230. Ms. K. stated she used to go to church but now she avoids most social situations, including her siblings and their families due to the drama. T232.

Ms. K. stated she had problems using her hands with weak grip and arthritis in her fingers. Id. Ms. K. stated she did not get along with others because she was self-conscious and paranoid. Id. Ms. K. stated she did not finish things she started, followed written directions okay, but might need spoken directions repeated a few times unless they are given one step at a

time.  Id.  She alleged the inability to perform all postural activities because of pain in her knees and shoulder and occasional back pain.  Id.  She said she could walk half a block before needing to stop and rest.  Id.

**F.    Ms. K.'s Testimony at ALJ Hearing**

Ms. K.'s hearing on November 20, 2019, lasted 44 minutes; starting at 3:03 PM and ending at 3:47 PM.  T37, 60.  Ms. K. testified she was 5'2" tall and weighed 220 pounds.  T39.  Ms. K. testified her last job was working as a licensed customer service representative at the Ben Hauk Agency.  T40.  She said she was licensed so she could assist customers and accept applications for insurance and those types of things.  T40-41.  Ms. K. said she had also worked as a licensed customer service representative at her prior insurance agency in Nebraska.  T41.  Ms. K. testified that her position at Ben Hauk Agency ended due to pain and the emotional issues because her boss wore on her patience.  T51.  She said it was hard to get out of the chair.  Id.  When she turned 62, she decided to take Social Security and then worked part time until her employer found someone to replace her.  T51-52.

Ms. K. testified her fibromyalgia made her hurt most of the time, sometimes she couldn't stand to have people touch her, the pain wakes her at night, and the pain makes it hard to function.  T46.  She rated the pain 7/10 and she treated it with Tylenol.  T46-47.  Ms. K. said the pain varies, one day it could be her shoulder and the next her arm, back or hips, but she has pain daily.  T46.  Ms. K. testified that the fibromyalgia caused her arm to go to sleep,

hurt, and get numb.  T47.  Ms. K. testified that when she had pain, she would be focused on the pain rather than her job.  T52.

Ms. K. testified she had problems gripping and holding things with her right hand, and sometimes her fingers didn't work.  T47.  She said she would not be able to reach into a refrigerator and grab a full gallon of milk.  Id.

Ms. K. testified she had her left knee replaced on October 28th and she had been using a cane before surgery and was now using a walker.  T48.  She said she also has pain and arthritis in her right knee.  Id.  Ms. K. testified she had problems with anxiety and depression and said she had issues dealing with people or getting along with people.  T50.  She said she keeps to herself, and she really didn't have any friends.  Id.  She explained she had issues in the past with co-workers and supervisors because she didn't have time for the dirty stories, swearing, gossiping, and that sort of thing that a lot of places thrive on.  T50-51.  Ms. K. testified she had issues staying focused and concentrating because she would daydream or get frustrated with something, and she would just shut down and not be able to finish her task.  T51.

## G.   Vocational Expert's Testimony

The vocational expert ("VE") testified that the second job on his past work summary should be changed to survey worker and everything else on the summary was the same.  T55.  Based on Ms. K.'s testimony at the hearing, the VE stated Ms. K. also worked as what Ms. K. called a "licensed customer service rep" and said it was DOT #219.387-014.  T55-56.  The VE said this job was still in the insurance industry but a little different than the jobs he had

listed on the work summary.  T56.  He said it was a semi-skilled job with a specific vocational preparation (SVP) level 4.  Id.  The VE said otherwise, the jobs listed in his work summary reflected her other jobs that she held.  Id.

The ALJ asked the VE a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ and defined Ms. K.'s past work as receptionist, unit clerk, postal clerk, licensed customer service rep, and cashier jobs, and the VE testified that the individual would be able to perform the jobs of licensed customer service rep and receptionist.  T58-59.  The VE testified that, if a limitation to performing simple routine tasks were added to the hypothetical, neither of those jobs would available.  T59.  The VE also testified that there would be no skills transfer.  Id.

The VE testified that an individual who was off task or unproductive more than one hour per workday, or an individual who was absent or left work early more than two days per month would not be able to maintain employment.  Id.  Ms. K.'s attorney at the time of the hearing did not have any questions for the VE.  T60.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as

adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, . . ., and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination."  Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th

Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the
ALJ applied an erroneous legal standard in the disability analysis.  Walker v.
Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  Erroneous
interpretations of law will be reversed.  Id.  The Commissioner's conclusions of
law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d
at 311 (finding "appropriate deference" should be given to the SSA's
interpretation of the Social Security Act).  Where "[s]everal errors and
uncertainties in the opinion, that individually might not warrant remand, in
combination create sufficient doubt about the ALJ's rationale for denying"
benefits, remand for further proceedings before the agency is warranted.
Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008).

**B.     The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any
substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death, or which has
lasted or can be expected to last for a continuous period of not less than twelve
months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The
impairment must be severe, making the claimant unable to do his previous
work, or any other substantial gainful activity which exists in the national
economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is
disabled.  This sequential analysis is mandatory for all SSD/DIB applications.

Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.

The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled, and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled, and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n. 2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to Step Four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not severe) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

> **Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at Steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at Step Five."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. K. asserts the Commissioner erred in three ways: (1) the Commissioner failed to identify all of Ms. K.'s medically determinable impairments and determine the severity of those impairments; (2) the RFC determined by the Commissioner is not supported by substantial evidence; and (3) the Commissioner failed to accurately identify Ms. K.'s past relevant work.

28

The Commissioner asserts: (1) the ALJ's properly found that Ms. K.'s fibromyalgia was not a severe, medically determinable impairment; (2) the ALJ's RFC finding is supported by substantial evidence; and (3) the ALJ accurately identified Ms. K.'s past relevant work.

## E.   Analysis

Ms. K.'s assignments of error are discussed in turn below.

### 1.   Whether the Commissioner failed to identify all medically determinable impairments and determine their severity

Ms. K. alleges the ALJ erred at Step Two of the sequential analysis by failing to identify her diagnosis of fibromyalgia as a medically determinable impairment and failing to determine its severity.  The claimant bears the burden to show that their impairment is severe, but this burden is not great. Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).  The sequential evaluation process may be terminated at Step Two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to do basic work activities.[9]  See Nguyen v. Chater, 75 F.3d 429, 430–31 (8th Cir. 1996).  Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond "a slight abnormality or a

---

[9] Basic work activities include, but are not limited to:  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  See 20 C.F.R. § 404.1522(b).

combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85–28, 1985 WL 56856, at *3; see also Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3rd Cir. 2003) ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue."). Any doubt as to whether the requisite showing of severity has been made is to be resolved in favor of the claimant. Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28).

Ms. K. cites Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at Step Two is not harmless error but is instead grounds for reversal. In Nicola, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning. Nicola, 480 F.3d at 887. The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe. Id. The court held the ALJ's failure to identify the impairment as severe was not harmless error. Id. The court reversed and remanded the case to the commissioner for further proceedings. Id.

As noted in Lund v. Colvin, Civ. No. 13-113 (JSM), 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of Nicola. Some courts have interpreted it to mean that an ALJ's erroneous Step-Two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other

impairments to be severe and therefore continued the sequential analysis. Other courts have declined to interpret <u>Nicola</u> as establishing a *per se* rule that any error at Step Two is reversible error, so long as the ALJ continues with the sequential analysis.  See <u>Lund</u>, 2014 WL 1153508, at *26 (gathering cases). The central theme in the cases which hold reversal is not required is that "an error at Step Two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC." <u>Lund</u>, 2014 WL 1153508, at *26 (quoting <u>Johnson v. Comm'r Soc. Sec.</u>, Civ. No. 11-1268 (JRT/SER), 2012 WL 4328413, at *21-22 (D. Minn. July 11, 2012)).

More recently, this district court has interpreted <u>Nicola</u> to require reversal for failure to properly identify a severe impairment at Step Two when that impairment is diagnosed and properly supported by sufficient medical evidence.  See <u>Quinn v. Berryhill</u>, Civ. No. 4:17-04013-KES, 2018 WL 1401807, at *5 (D.S.D. Mar. 20, 2018) (error at Step Two not harmless where ALJ failed to identify medically determinable impairments).  In <u>Quinn</u>, the court acknowledged the district court split within the Eighth Circuit as described in <u>Lund</u>, but decided that, in Ms. Quinn's case, the error was not harmless.  <u>Id.</u> at *6.

> Here, the ALJ did not mention Quinn's obesity, and he did not make a finding as to whether Quinn's scoliosis or neck impairment—which he noted Quinn testified about—were medically determinable impairments that were either severe or not severe.  There is evidence in the record to support such diagnoses, so they should have been addressed in the step two analysis.  Because medically determinable impairments are so important to the RFC analysis at step four, the court finds that the ALJ's insufficient findings regarding Quinn's medically determinable

31

severe impairments at step two require remand for further development.

Id. at *6.

In SSR 12-2p, the SSA has provided guidance on how the evidence must be developed to establish a medically determinable impairment of fibromyalgia. Pursuant to SSR 12-2p, a person has a medically determinable impairment of fibromyalgia if he or she has all three of the following:

1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination.  The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.  The 18 tender point sites are located on each side of the body at the occiput, low cervical spine, trapezius muscle, supraspinatus muscle, second rib, lateral epicondyle, gluteal, greater trochanter, and inner aspect of the knee.

3. Evidence that other disorders that could cause the symptoms or signs were excluded.

See SSR 12-2P, 2012 WL 3104869, at *3.

Alternative criteria defined in SSR 12-2p focuses on repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions.  Id.  These symptoms, signs, or co-occurring conditions include: muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision,

fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, bladder spasms, anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome.  Id. at *3 n.9 & n.10.

The ALJ held that, although the claimant's treatment provider, Dr. Rachel Sunne, M.D., indicated that clinically the claimant has fibromyalgia, it was not a medically determinable impairment.  T18.  In its short, one-paragraph discussion on this issue, the ALJ reasoned that there was no evidence in the record that the claimant was diagnosed with fibromyalgia by an acceptable medical source pursuant to the requirements set forth in SSR 12-2p.  Id.  Specifically, the ALJ held that there was no evidence of the location of the claimant's pain with palpation in at least eleven tender point sites or that she had repeated manifestations of six or more fibromyalgia symptoms during the relevant period, with evidence that other disorders that could cause the symptoms were excluded.  Id.  The court disagrees.

The Eighth Circuit has long recognized the disabling nature of fibromyalgia.  See Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004).  The disease is chronic, and "diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests."  Id. (quoting

Brosnahan v. Barnhart, 366 F.3d 671, 672 n.1 (8th Cir. 2003)).  The first requirement under SSR 12-2p—widespread pain in all quadrants of the body persisting for at least three months—is well documented in the record.

First, Ms. K. was seen by Dr. Sunne at AMG Brookings on October 3, 2017, for generalized pain due to fibromyalgia, with the worst pain in her left shoulder, upper arm, and left upper back.  T400.  Ms. K. reported her left shoulder pain as 10/10 at that time.  T402.  Second, Ms. K. was seen by Dr. Sunne at AMG Brookings on January 10, 2018, for generalized achiness and weakness through her shoulder and upper arm area ongoing for months. T397.  Next, Ms. K. was seen by Dr. Sunne at AMG Brookings on February 27, 2018, for her pain not being entirely resolved by Cymbalta and due to mornings where she ached all over her body.  T372.  Next, Dr. Sunne wrote a letter on October 1, 2019, in which she stated that, due to Ms. K.'s medical conditions, especially regarding her fibromyalgia, anxiety, and depression, Ms. K. was unable to work any type of job 8 hours per day, 5 days per week. T913.  Further, in this letter, Dr. Sunne indicated that the pain associated with fibromyalgia limited Ms. K.'s physical activity.  Id.  Clearly, given this evidence in the record, Ms. K. has sufficiently alleged widespread pain to meet the first requirement of SSR 12-2p.

The second requirement under SSR 12-2p is the existence of pain in at least 11 of 18 listed tender points.  In their response, the Commissioner incorrectly states Ms. K. admitted her treating physician did not document any tender points.  See Docket No. 20, p. 5.  In fact, Ms. K. alleged that, while

Dr. Sunne did not document Ms. K.'s tender points as precisely as listed in SSR 12-2p, Dr. Sunne did find tenderness to palpation in 11 or more locations. See Docket No. 18, p. 6.  Ms. K. was seen by Dr. Sunne at AMG Brookings on January 10, 2018, for an overactive bladder, weight gain, and aching in her arms and legs.  T394.  Dr. Sunne's examination revealed tenderness to palpation diffusely through the back to the bilateral paraspinous muscles, over the shoulders and upper arms, and tenderness to light palpation over the lower extremities.  T397.

Ms. K. argues those findings by Dr. Sunne *could* address "the base of the skull, back and side of the neck, shoulder, supraspinatus muscle near shoulder blade, outer elbow, top of buttock, greater trochanter below the hip, and the inner knee."  See Docket No. 18, p. 6.  Furthermore, Ms. K. argues that one *could* conclude that 11 or more tender points were identified in this examination.  Id.  The court is not privy to making this medical determination. Whether Dr. Sunne's findings during her examination of Ms. K. on January 10, 2018, identify at least 11 of the 18 tender points listed in SSR 12-2p is a question for a medical practitioner to determine, not the courts.

As the Eighth Circuit has consistently held, if the record is not sufficient for the ALJ to determine whether the claimant is disabled, they must develop the record further.  McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  When there is insufficient evidence for the ALJ to determine if the claimant is disabled, the regulations impose a duty on the ALJ to either recontact a treating source, request additional records, order a consultative examination,

35

or ask the claimant or others for more information.  20 C.F.R. 404.1520b(b);

Bowman v. Barnhart, 310 F.3d 1080, 1084-85 (8th Cir. 2002) (ALJ obligated to

contact treating physician if additional information is needed).  An ALJ may

recontact medical sources and order consultative evaluations only if the

available evidence does not provide an adequate basis for determining the

merits of a disability claim.  Sultan v. Barnhart, 368 F.3d 857,

863 (8th Cir. 2004).

Recently, in Grindley v. Kijakazi, the Eighth Circuit dealt with the issue

of whether the ALJ's decision should be reversed because it failed to develop a

sufficient record on the factual issue of "tender points," which are indicative of

a fibromyalgia diagnosis.  Grindley v. Kijakazi, 9 F.4th 622, 629 (8th Cir.

2021).  In Grindley, after an administrative hearing, the ALJ denied Grindley's

claim for disability benefits.  Id. at 627.  The ALJ found that Grindley had

severe impairments including fibromyalgia, lupus, and other ailments.  Id.

Grindley argued that the ALJ's mention of her tender points was inconsistent

throughout the decision and that remand was required to fully develop the

record on this crucial issue.  Id. at 629.

The Grindley court held that, "[w]hile the ALJ has an independent duty

to develop the record in a social security disability hearing, the ALJ is not

required to seek additional clarifying statements from a treating physician

unless a crucial issue is undeveloped."  Id. at 629-30 (quoting Jones v. Astrue,

619 F.3d 963, 969 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791

(8th Cir. 2005))).  Ultimately, the Grindley court held that the tender-points

36

testing issue did not require further development because there was substantial evidence of Grindley's fibromyalgia without the tender-points analysis. Id. at 630. Furthermore, the court held that this case was *not* a close call, and clarification on the tender-points issue would not have significantly swayed the ALJ's decision. Id.

As in Grindley, the tender-points issue in this case is underdeveloped. Again, under SSR 12-2p, to have a medically determinable impairment of fibromyalgia, a claimant must show sufficient medical evidence of tenderness in 11 of 18 tender points. Here, Dr. Sunne's examination revealed tenderness to palpation diffusely through the back to the bilateral paraspinous muscles, over the shoulders and upper arms, and tenderness to light palpation over the lower extremities. T397. Based upon this evidence, it is unclear whether Ms. K. met the tender-points criterion of SSR 12-2p.

However, following Grindley, remand is appropriate only for *crucial* issues; if there is substantial evidence in the record—even without a conclusive tender-points analysis—of Ms. K.'s fibromyalgia, the tender-points issue is not crucial, and remand is not warranted on this issue. Here, as discussed previously and discussed below, there is substantial evidence of widespread pain, evidence that other disorders that could cause the symptoms or signs were excluded, and evidence of repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions. Nevertheless, there is a clear contention as to existence of tenderness with palpation of 11 of 18 tender points. Ms. K. argues that Dr. Sunne's findings *could* address 11 or

37

more tender points, while the Commissioner argues, and the ALJ subsequently held, that there was no evidence of the tender point location sites. Thus, unlike in Grindley, this evidence is close, and the ALJ ultimately concluded Ms. K.'s fibromyalgia was not a medically determinable impairment.

Therefore, in the absence of other substantial evidence of Ms. K.'s fibromyalgia, whether or not she exhibited tenderness with palpation of 11 of 18 tender points is crucial to the issue of whether her fibromyalgia is a medically determinable impairment. Therefore, because the issue of tender points under SSR 12-2p(II)(A)(2) is crucial to whether the ALJ erred at Step Two by excluding fibromyalgia from Ms. K.'s medically determinable impairments, remand is appropriate for the ALJ to further develop the record on whether Ms. K. experiences tenderness with palpation of at least 11 of 18 tender points.

The third requirement under SSR 12-2p is evidence that other disorders that could cause the symptoms or signs were excluded. The Commissioner argues that Ms. K. has not shown any such evidence. See Docket No. 20, p. 6. The court disagrees. Following Ms. K.'s examination on January 10, 2018, Dr. Sunne felt Ms. K.'s differential diagnosis for weakness included fibromyalgia *versus* polymyalgia rheumatica, so erythrocyte sedimentation rate and ordered C-reactive protein will be checked and, if inflammatory markers are normal, fibromyalgia is suspected. T398. Thus, Ms. K. has sufficiently met her burden to show medical evidence that other disorders that could cause the symptoms or signs were excluded under SSR 12-2p(II)(A)(3).

Finally, the additional criterion set forth in SSR 12-2p is evidence of repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions.  Ms. K. argues there is well documented evidence of repeated manifestations of fibromyalgia in the record.  Docket No. 18, p. 6.  The Commissioner argues the symptoms that Ms. K. cites, such as depression, pain, and overactive bladder, could be related to other causes that were not excluded, including her medically determinable impairments of arthritis, plantar fasciitis, pes planus, osteoarthritis of the knees, obesity, depressive disorder, and anxiety.  Docket No. 20, p. 5.

On April 25, 2017, Ms. K. was seen at Avera Medical Group Brookings for depression.  T415.  While at Avera, Ms. K. scored a PHQ-9 score of 20, which could be indicative of severe depression.  T415, 417.  Next, Ms. K. was seen by Sandra Diedrich on May 10, 2017, for depression, irritability, having a "foggy mind," anxiousness, insomnia, processing difficulty, poor memory, feelings of low self-worth, and feeling overwhelmed.  T608.  On June 15, 2017, Ms. K. was seen by Dr. Sunne at AMG Brookings for her depression; Ms. K.'s PHQ-9 score was 9, or mild.  T408, 410.  Then, Ms. K. was seen by Dr. Sunne at AMG Brookings on October 3, 2017, for generalized pain, with the worst pain in her left shoulder, upper arm, and left upper back.  T400.

On January 10, 2018, Ms. K. was seen by Dr. Sunne at AMG Brookings for an overactive bladder, generalized achiness and weakness, fatigue, depression, muscle soreness, and urinary incontinence.  T394, 397, 398.  On February 27, 2018, Ms. K. was seen by Dr. Sunne at AMG Brookings for

depression, diffuse pains, and fatigue.  T372.  On April 30, 2018, Ms. K. was
seen by Dr. Sunne at AMG Brookings for urinary frequency issues.  T366.
Again, on May 3, 2018, Ms. K. was seen at AMG Specialty Care to follow up on
her concerns over urinary stream direction and frequency.  T294.  On May 9,
2019, Ms. K. was seen by Dr. Sunne at AMG Brookings for dizziness, vertigo,
and chronic left knee pain.  T879, 885.  Finally, on September 16, 2019, Ms. K.
was seen by Dr. Sunne at AMG Brookings for intolerable knee pain rated
10/10 and daily heart palpations related to anxiety.  T825, 827, 828.

All the medical issues listed above are fibromyalgia symptoms, signs, or
co-occurring conditions pursuant to SSR 12-2p.  Thus, given this evidence,
Ms. K. has sufficiently asserted repeated manifestations of six or more
fibromyalgia symptoms, signs, or co-occurring conditions pursuant to
SSR 12-2p.

The Commissioner also argues that even if the ALJ, like the state agency
medical experts, found Ms. K.'s fibromyalgia to be a severe impairment, the
ALJ's RFC finding would not have been more restrictive, and thus any error is
harmless.  Docket No. 20, p. 7.  The Commissioner argues that, because the
state agency medical experts recommended certain exertional limitations, and
the ALJ adopted all these limitations and added the additional restriction to
standing and/or walking 2 hours per workday, the ALJ's RFC finding would
not have changed, regardless of if the ALJ found that Ms. K.'s fibromyalgia was
a severe medically determinable impairment.  Id.  The court rejects this
argument.

First, Dr. Sunne did not agree with the exertional limitations set forth by the state agency consultants—she opined that, due to Ms. K.'s medical conditions, especially regarding her fibromyalgia, anxiety, and depression, she was unable to work any type of job 8 hours per day, 5 days per week.  T913. Further, Dr. Sunne stated that Ms. K.'s fibromyalgia is a chronic problem that will not resolve and will likely continue to limit her abilities moving forward.  Id. The ALJ's Step-Two error is intertwined with the ALJ's mischaracterization of Dr. Sunne's opinion and diagnosis of Ms. K.'s fibromyalgia.  The court has concluded previously that, if the ALJ felt Dr. Sunne's opinion was ambiguous as to the grounds for diagnosing fibromyalgia, the ALJ should have made additional inquiries with Dr. Sunne and/or obtained a consultative exam.  In fact, Dr. Sunne expressly invited inquiry if further assistance was needed. T913.  Just because Dr. Sunne and the state agency consultants agree on the fact that Ms. K. had a severe medically determinable impairment of fibromyalgia does not necessarily mean that they agree upon the exertional limitations that stem from that disability.  The court cannot conclude, on the present record, that it was harmless error for the ALJ to fail to find Ms. K.'s fibromyalgia to be a severe impairment at Step Two.

Therefore, because there is evidence of (1) widespread pain, (2) evidence that other disorders that could cause the symptoms or signs were excluded, and (3) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, the ALJ's conclusion that the record did not support a medically determinable impairment of fibromyalgia is not supported by

41

substantial evidence.  Furthermore, because the record is insufficient for the ALJ to determine the existence of 11 out of 18 tender points under SSR 12-2p(II)(A)(2), the ALJ has failed its duty to fairly and fully develop the record as to a crucial issue.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  Thus, remand is appropriate for the ALJ to determine at Step Two whether Ms. K. has a medically determinable impairment of fibromyalgia and to determine whether it significantly limits Ms. K.'s physical or mental ability to do basic work activities.  See 20 C.F.R. § 404.1522(a).  Additionally, the ALJ is ordered to further develop the record as to the issue of tender points under SSR 12-2p(II)(A)(2) through recontacting Dr. Sunne and/or ordering a consultative evaluation.

### 2. Whether the Commissioner's RFC determination is supported by substantial evidence

To complete the fourth step of the sequential evaluation, the ALJ must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations.  Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004); Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001); 20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians, and the claimant's own description of their limitations.  Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).  The ALJ's RFC finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003) (citation omitted).

The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's disability.  20 C.F.R. § 404.1545(b) & (c).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are non-severe.  Lauer, 245 F.3d at 703; see also SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual function capacity based on all relevant evidence . . . a claimant's residual functional capacity is a medical question."  Lauer, 245 F.3d at 704 (citation omitted).  Therefore, "[s]ome medical evidence . . . must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id.  (citations omitted).

Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source

statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p, 1996 WL 374184, at *5.

When writing the RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . ..  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id. at *7.  Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  SSR 96-8p at n.8.

Finally, "to find a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923 (quotation omitted, punctuation altered).  RFC is not demonstrated by "the ability merely to lift weights occasionally in a doctor's office."  Juszczyk v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008) (quotation omitted).  See also SSR 96-8p, 1996 WL 374184, at *1 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

###### a.   Whether the ALJ Erred in Formulating Ms. K.'s Physical RFC

Ms. K. asserts the ALJ erred in failing to consider all the functional limitations caused by her physical impairments in determining the RFC.  The court agrees.

At Step Two, the ALJ found severe physical impairments of arthritis of the left acromioclavicular joint, pes planus of the right foot, plantar fasciitis of the right foot, osteoarthritis of the bilateral knees, and obesity.  T17.  At Step Four, the ALJ found Ms. K. has the following physical limitations: to perform sedentary work, except the claimant can lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk two hours in an eight-hour workday, and sit six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; frequently reach overhead with the left upper extremity; and should avoid all exposure to workplace hazards.  T21.

As previously addressed, the ALJ erred in failing to develop the record on a crucial issue as to whether fibromyalgia is a severe medically determinable impairment. See Section (E)(1).  Ms. K. asserts the ALJ erred by not evaluating whether her fibromyalgia required incorporation of any functional limitations when formulating her RFC.  See Docket No. 18, p. 10.  In response, the Commissioner states "[t]he ALJ considered [Ms. K's] fibromyalgia throughout his RFC analysis, but [Ms. K.] failed to prove her condition resulted in more limitations than the ALJ assessed."  Docket No. 20, p. 8.  The Commissioner also argues that, because the state agency consultants found Ms. K. to have a

severe impairment of fibromyalgia and the ALJ adopted the functional limitations set forth by them, the ALJ accurately incorporated limitations from Ms. K.'s fibromyalgia into the RFC.  Docket No. 20, p. 7.  Again, the court disagrees.

Here, Dr. Sunne's opinions regarding the functional limitations associated with Ms. K.'s fibromyalgia differed from the state agency consultants' opinions that the ALJ relied on.  Due to the ALJ's failure to properly develop the record as to Dr. Sunne's diagnosis of Ms. K.'s fibromyalgia and opinions on the functional limitations that stem from the diagnosis, the court is unable to ascertain whether the ALJ would have formulated a different RFC had the ALJ properly handled the analysis at Step Two.  Looking at the longitudinal evidence in the record, both Dr. Sunne and the state agency consultants found Ms. K. to have a severe impairment of fibromyalgia.  Thus, the ALJ should have considered, and evaluated, the functional limitations addressed by Dr. Sunne, and not just those set forth by the state agency consultants, when formulating his RFC.

Due to the ALJ's failure to properly develop the record as to Dr. Sunne's diagnosis of Ms. K.'s fibromyalgia and opinions on the functional limitations that stem from the diagnosis, remand is appropriate for the ALJ to reevaluate any limitations associated with Ms. K.'s medically determinable impairment of fibromyalgia.

### b.   Whether The ALJ Erred in Formulating Ms. K.'s Mental RFC

At Step Two, the ALJ found Ms. K. had medically determinable mental impairments of depressive disorder and anxiety disorder.  T18.  In making this finding, the ALJ considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments.  Id.; See 20 C.F.R. §404(P) (also known as "paragraph B" criteria).  After consideration, the ALJ found Ms. K. did not have more than a mild limitation in any of the paragraph B functional areas, including understanding, remembering or applying information, interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself.  T18.  The ALJ held that Ms. K.'s medically determinable impairments of depressive disorder and anxiety disorder did not cause more than minimal limitations in Ms. K.'s ability to perform basic mental work activities and were, therefore, non-severe.  Id.

Ms. K. argues the ALJ erred in formulating her mental RFC because there was no discussion or consideration of Ms. K.'s mental limitations in the discussion of the RFC and no mental limitations were ultimately included.  See Docket No. 18, p. 14.  In response, the Commissioner argues that the ALJ considered Ms. K.'s non-severe depression and anxiety throughout his RFC, however, Ms. K. failed to prove that these impairments resulted in mental RFC limitations.  See Docket No. 20, p. 12.  The court agrees in part.

At Step Four, the ALJ found no mental limitations in the RFC.  T21.  In making this determination, the ALJ failed to discuss how and why it came to

this decision.  The Commissioner's argument that Ms. K.'s mental impairments of depression and anxiety did not cause more than mild limitations in any of the paragraph B functional areas relates to the ALJ's determinations at Step Two and Step Three, not Step Four.  Because the ALJ failed to discuss how it came to its determination to exclude mental limitations from the RFC at Step Four, any arguments made by the Commissioner will not be considered because the ALJ did not articulate those rationales in its decision.  This finding is known as the Chenery doctrine, named for SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943). Under this doctrine, the Commissioner cannot generate on appeal new rationales for the ALJ's conclusion.

In Chenery, the Supreme Court held that when a court is reviewing an agency decision, the reviewing court is limited to examining agency action on "the grounds upon which the Commission itself based its action."  Id. at 88. The Eighth Circuit has interpreted Chenery to stand for the premise that "a reviewing court may not uphold an agency decision based on reasons not articulated by the agency[] when the agency has failed to make a necessary determination of fact or policy upon which the court's alternative basis is premised."  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) (quotation and brackets omitted).  See also Michigan v. EPA, 576 U.S. 743, 758 (2015) (stating it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action.").  "Chenery demands that an ALJ provid[e] reasoning behind his determination of fact or policy so that a reviewing court can perform the

requisite judicial review." Nills v. Saul, No. 5:18-CV-05079-KES, 2019 WL 6078643, at *5 (D.S.D. Nov. 15, 2019).  Thus, the Commissioner's argument that the ALJ considered Ms. K.'s non-severe depression and anxiety throughout his RFC is baseless.

There is no automatic requirement that an ALJ must discuss every impairment, severe or not, found at Step Two in the RFC at Step Four.  Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015).  But impairments found at Step Two, whether severe or not, should be considered by the ALJ when formulating the RFC at Step Four.  Id.  In fact, the ALJ is directed to consider *all* of a claimant's impairments, both those that are severe and those that are not severe, when formulating RFC at Step Four.  The key question as to whether functional limitations from an impairment found at Step Two are included in the RFC is whether there is substantial evidence that the impairment actually limits the claimant's ability to work.  Id. at 885 (quoting Taylor v. Astrue, Civil Action No. BPG-11-0032, 2012 WL 294532, at *8 (D. Md. Jan. 31, 2012)).

The record does not demonstrate there is substantial evidence that Ms. K.'s mental impairments resulted in limitations to her ability to work. Considering the longitudinal evidence in the record, Ms. K. has neither shown, nor argued, that her non-severe mental impairments of depressive disorder and anxiety disorder affect her ability to perform work-like activities.  Again, Ms. K. bears the burden of proving her RFC.  Michel v. Colvin, 640 F. App'x 585, 592 (8th Cir. 2016); see also 20 C.F.R. § 404.1520(a)(4)(iv).  Accordingly, the ALJ

did not err by failing to include functional limitations from these impairments in the RFC at Step Four.

Furthermore, Ms. K. argues that, because she has severe physical impairments that unquestionably caused chronic pain, the effects of that chronic pain on her ability to perform the mental tasks required for work should have been considered in the RFC.  Docket No. 18, p. 13.  In Ortman v. Saul, the claimant argued the ALJ should have undertaken some analysis to determine the mental limitations caused by the combination of the severe physical impairments of multiple sclerosis and fibromyalgia.  Ortman v. Saul, No. 4:19-CV-04049-VLD, 2019 WL 6829207, at *17 (D.S.D. Dec. 13, 2019). The claimant argued that, pursuant to SSR 96-8p, the RFC assessment must include "any related symptoms" resulting from an individual's medically determinable impairments or combination of impairments.  Id.  The claimant argued that she had mental symptoms resulting from the combination of her multiple sclerosis and fibromyalgia, and, thus, the ALJ erred by failing to address her ability to sustain work-related mental tasks and activities in a work setting on a regular and continuing basis.  Id.  Ultimately, the Ortman court found that the ALJ failed to seek a medical opinion regarding her mental health as they pertained to her severe physical impairments.  Id.  Furthermore, the Ortman court held that upon remand the evidence considered should include a direct inquiry to the medical experts about the effect of Ms. Ortman's combined physical impairments upon her mental ability to function in the workplace.  Id. at 18.

50

Here, this court has already ordered remand for the ALJ to properly reconsider the symptoms associated with Ms. K.'s fibromyalgia and the limitations said symptoms would impose upon Ms. K.'s physical RFC.  The court also finds remand appropriate so the ALJ can properly consider what effects, if any, Ms. K.'s fibromyalgia has on her ability to perform work-like activities.  This would include a consideration of whether the pain from Ms. K.'s fibromyalgia poses functional limitations on her ability to concentrate and maintain pace and persistence.

The Commissioner also argues that, despite concentration problems, the ALJ noted Ms. K. was able to complete most personal care tasks, prepare simple meals, complete basic housework, drive a car, go out alone, shop in stores, manage her finances, and follow written instructions.  T228, 229, 232.  However, the Eighth Circuit has held that a claimant's ability to engage in some life activities does not support a finding that she retains the ability to work.  See Forehand, 364 F.3d at 988 ; see also Brosnahan, 336 F.3d at 677 ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity.").  Again, to determine whether a claimant has the residual functional capacity necessary to be able to work, the court looks to whether she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  McCoy, 683 F.2d at 1147.  This test is consistent with relevant

51

regulations on the issue, see 20 C.F.R. § 404.1545, and has been reiterated by the Eighth Circuit on numerous occasions.  Id.

Accordingly, remand is appropriate so that the ALJ can consider whether Ms. K.'s mental and physical impairments, both severe and non-severe, result in work-related mental limitations.  Any such limitations need to be included in the RFC at Step Four.

### 3. Whether the Commissioner failed to accurately identify the past relevant work?

At the fourth step of the sequential evaluation, the ALJ considers whether the claimant has the residual functional capacity to engage in any of their past relevant work.  20 C.F.R. § 404.1520(f).  Past relevant work is work that a claimant has done within the past 15 years, was substantial gainful activity, and lasted long enough for the claimant to learn to do it.  20 C.F.R. § 404.1560(b)(1).  To determine past relevant work, the ALJ may consider, but is not limited to:  the claimant's testimony, other individuals' testimony who know about the claimant's work, the services of vocational experts or vocational specialists, the Dictionary of Occupational Titles ("DOT") and its companion volumes and supplements, and expert opinion testimony. 20 C.F.R. § 404.1560(b)(2).  If the ALJ finds that the claimant has the residual functional capacity to do their past relevant work, the ALJ will hold that the claimant is not disabled.  20 C.F.R. § 404.1560(b)(3).  The claimant bears the burden of proving they cannot perform their past relevant work.  Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).

At Step Four, the ALJ held that Ms. K. could perform past relevant work as a licensed customer service representative, DOT # 219.387-014, as generally performed, and denied Ms. K.'s claim.  T28.  In reaching this decision, the ALJ relied on vocational expert testimony.  Id.  According to the record, in October 2019, the vocational expert prepared a preliminary past relevant work summary, which included the job of insurance agent, DOT #250.257-010, a skilled, specific vocational preparation level 6 job.  T275.  The vocational expert based his summary on Ms. K.'s work history report, in which she described her job titles from May 2012 through December 2017 as either insurance agent or agent assistant.  T217.

Ms. K. reported that as an insurance agent, she "answered telephones, sold insurance policies, made changes to policies, filed documents, received payments."  T217-18, 220-21.  Further, Ms. K. reported that as an agent assistant, she "sold insurance policies, received premium payments from customers, made changes to policies, filed documents."  T217-18.  However, after hearing Ms. K.'s testimony, the vocational expert stated he must change his prior summary, noting that Ms. K.'s testimony more accurately described the job of insurance clerk, DOT #219.387-014, a semi-skilled job with an SVP level 4.  T55-56.  According to the DOT, the duties of this job include compiling records of insurance policies, filing records of insurance transactions, filling in data on renewal policy applications, and forwarding applications to insurance companies.  See DOT #219.387-014.  The vocational expert explained his decision to change the DOT classification of Ms. K.'s past work in the

insurance industry was based on her testimony as well as his experience, knowledge, and education.  T28.

Ms. K. rejects this finding and argues that the occupation most related to her work in the insurance industry was an "insurance agent," or DOT #250.257-010.  According to the DOT, the duties of this job include selling insurance to new and current clients, contacting prospective clients to discuss policies, calculating and quoting premium rates for recommended policies, contacting policyholders to explain policies and suggesting additions or changes, and collecting premiums from policyholders.  See DOT #250.257-010.  Additionally, to be considered an "insurance agent" under this occupational title, the claimant must hold a license issued by the state.  Id.

Ms. K. argues the record indicates her work in the insurance industry was that of a licensed insurance agent, DOT #250.257-010, rather than an insurance clerk, DOT #219.387-014.  Docket No. 18, p. 16.  Ms. K.'s reasoning is that "the evidence is undisputed that [Ms. K.] was licensed and that she sold insurance."  Docket No. 21, p. 5.  Furthermore, Ms. K. argues that, because DOT #219.387-014 does not mention selling insurance or being licensed, it would be inaccurate to find her past relevant work to be that of an insurance clerk.  Docket No. 18, p. 16.  The court disagrees.

While Ms. K. is correct that DOT #219.387-014 does not mention selling insurance or being licensed, the vocational expert accurately found that its definition is more closely related to the work that Ms. K. conducted at Ben Hauk Agency and Allied Security.  See Docket No. 18, p. 16.  In her work

54

activity report completed as part of the application process, Ms. K. stated that she "sold insurance policies, made changes to policies, filed documents, and received payments." T217-18, 220-21.  Beyond selling insurance policies, the duties Ms. K. listed on her report, and the duties she testified to at her hearing, support the conclusion that she worked as an insurance clerk pursuant to DOT #219.387-014.

At her hearing, Ms. K. was asked by the ALJ, "what did you do for the Ben Hauk Agency?"  T40.  In response, Ms. K. testified that she was a "licensed customer service representative," not an insurance agent.  Id.  Ms. K. then testified that Ben Hauk was the insurance agent, and she was licensed so that she could wait on the agency's customers and complete insurance applications. Id.  At no point during her testimony did Ms. K. indicate she was an insurance agent or sell insurance for Ben Hauk Agency.  Ms. K. then testified that she was also a licensed customer service representative for Allied Security, not an insurance agent.  T41.  Furthermore, Ms. K. confirmed that both positions were considered desk jobs.  Id.  Ms. K. bears the burden of showing that a prejudicial error was made.  See Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

While the ALJ's denial at Step Four may have been based on substantial evidence previously, this court is ordering remand for errors at Step Two and Step Four.  Therefore, on remand, a new RFC may be formulated.  If a new RFC is formulated, the ALJ will need to compare it to Ms. K.'s past relevant work to make a new determination as to whether she can perform it.  At this point, due

to errors identified earlier in the opinion, the court cannot say whether Ms. K. can perform her past relevant work.  Thus, on remand, upon correcting the errors at Steps Two and Four, the ALJ shall determine if Ms. K. has the ability to perform past relevant work at Step Four considering the RFC arrived at upon remand.

**F.   Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Ms. K. requests reversal of the Commissioner's decision with remand and instructions for an award of benefits.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause of a rehearing."  42 U.S.C.  § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for

good cause was not presented during the administrative proceedings.  Id.
Neither sentence six situations apply here.

A sentence four remand is applicable in this case.  Remand with
instructions to award benefits is appropriate "only if the record overwhelmingly
supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding
of an improper denial of benefits, but the absence of overwhelming evidence to
support a disability finding by the Court, out of proper deference to the ALJ the
proper course is to remand for further administrative findings.  Id.; Cox v.
Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence
is overwhelming, but because the record evidence should be clarified and
properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir.
2005) (an award of benefits by the court is appropriate only if all factual issues
have been resolved and the record supports a finding of disability).  Therefore,
a remand for further administrative proceedings is appropriate.

[This space was left intentionally blank]

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is

hereby

ORDERED that the Commissioner's decision is REVERSED and

REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.


DATED October 8, 2021.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge